IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CP ANCHORAGE HOTEL 2, LLC d/b/a ANCHORAGE HILTON, | Case No. 3:18-cv-00071-JMK |
| Plaintiff, | |
| vs. | **ORDER REGARDING SUMMARY JUDGMENT [Docket 93]** |
| UNITE HERE! LOCAL 878, *et al.*, | |
| Defendants. | |

## I.   MOTIONS PRESENTED

Defendants Unite Here! and Unite Here! Local 878 (hereinafter, at times, collectively the "Union") filed a motion for summary judgment.[1]  Plaintiff CP Anchorage Hotel 2, LLC, d/b/a Anchorage Hilton ("Hilton") opposed.[2]  Defendants filed a reply.[3] Each party since has filed supplemental briefs and authorities[4] in support of their summary

---

[1] Docket 93.

[2] Docket 103.

[3] Docket 113.  While the motion for summary judgment was in briefing, Plaintiff filed a Rule 56(d) motion to continue Defendants' motion for summary judgment, which is now fully briefed.  Dockets 107; 116; 122.  *See* separate order issued today.  Also ripe for decision is Defendants' motion to strike. Dockets 118; 125; 127.  *See* section VII, *infra*.

[4] Dockets 136; 138 (supplemental briefing filed prior to oral argument); 144; 147; 147-1; 148; 149; 151 (additional authorities and subsequent briefing); 152; 153; 154; 156; 157 (Hilton's two additional exhibits and related briefing).

judgment position, before and after oral argument.[5]  The Court heard oral argument on summary judgment on January 28, 2021.  Briefing was completed July 26, 2021.

## II.   PROCEDURAL HISTORY

Hilton filed a Complaint on March 9, 2018,[6] and an Amended Complaint on May 6, 2019,[7] alleging an illegal secondary boycott in violation of § 8(b)(4)(ii)(B) of the National Labor Relations Act ("NLRA"),[8] and an entitlement to damages under § 303 of the Labor Management Relations Act ("LMRA").[9]

Hilton alleges first that since March 2017 the Union "has engaged in illegal secondary boycotting through its harassment and fraud campaign" and "harassment and intimidation . . . for the purpose of forcing [secondary businesses] and others to cease doing business with the Anchorage Hilton . . . to pressure the Anchorage Hilton in its collective bargaining agreement negotiations."[10]  Hilton contends this illegal secondary boycotting caused monetary damages that they are entitled to recover under § 303.[11]

Second, Hilton also brings a defamation claim under Alaska state law.[12]

---

[5]  *See* Dockets 133; 150; 155 (granting leave to file supplemental briefs, notices, and exhibits).  This Court ruled on previously-filed motions to quash and a motion to compel deposition at Docket 128, which the parties contended would affect their arguments for the instant summary judgment motion.

[6]  Docket 1.

[7]  Docket 52.

[8]  29 U.S.C. § 158(b)(4).

[9]  29 U.S.C. § 187.

[10]  Docket 52 at 8.

[11]  *Id.*

[12]  *Id*. at 9.

On July 7, 2020, Defendants moved for summary judgment on both the NLRA and LMRA claim and the defamation claim. Hilton responded in opposition and requested oral argument.[13] Defendants replied, asserting that Plaintiff has pled insufficient evidence to defeat summary judgment.[14] This Court then allowed further discovery,[15] after which the parties introduced additional evidence to the summary judgment motion.[16] Plaintiff filed a supplemental response to include additional facts from recent depositions.[17] Correspondingly, Defendants filed a reply[18] and pre-oral argument briefing was completed. While this Court's decision was pending, the parties filed additional supplemental briefing and exhibits,[19] which this Court accepted.[20]

## III. FACTUAL BACKGROUND

As the Court previously summarized in its order granting in part and denying in part Defendants' motion to dismiss,[21] facts relevant to the Court's analysis are as follows: Hilton is a limited liability corporation incorporated in Delaware with its principal place of business in Crestview Hills, Kentucky. Hilton operates the Anchorage Hilton at 500 West Third Avenue, Anchorage, Alaska.[22] In 2009, the Union began a boycott against

---

[13] Docket 103.
[14] Docket 113.
[15] *See* Docket 128.
[16] *See* Dockets 131; 133.
[17] Docket 136.
[18] Docket 138.
[19] Dockets 144; 147; 147-1; 148; 149; 151; 152; 153; 154; 156; 157.
[20] Dockets 150; 155.
[21] *See* Docket 31.
[22] Docket 52 at 2.

the Anchorage Hilton in response to a labor dispute that began in 2008.[23] The boycott efforts included demonstrations in front of the Anchorage Hilton, as well as solicitations to neutral parties.[24] Plaintiff's current claims involve Union communications and activity directed at two entities: Veterinary Cancer Society and Alaska Society for Human Resource Management State Council. The parties do not dispute that in the framework of the NLRA and LMRA these organizations are "third-party neutral" entities. Each group contracted with the Hilton, the primary target of the labor dispute's boycott. Questions for the Court are whether the Union engaged in an illegal secondary boycott that caused Hilton to incur damages, and whether the Union is liable for defamation.

## A.    Facts Regarding VCS

The Veterinary Cancer Society ("VCS") is a non-profit education organization located in Columbia, Missouri, that provides information and assistance to pet owners seeking treatment options for pets diagnosed with cancer.[25] Its members are approximately 1,000 individuals in veterinary practices.[26] In May 2014, VCS entered into a contract with Hilton to hold its 2018 mid-year conference at the Anchorage Hilton in March 2018.[27] In November 2016, VCS and Hilton amended their contract by increasing the number of rooms that Hilton would provide and the number of rooms for which VCS would be responsible.[28]

---

[23] *Id*. at 3.
[24] *Id*.
[25] *Id*. at 3; Docket 103 at 8.
[26] Dockets 52 at 3; 104-1 at 46.
[27] Docket 52 at 3.
[28] *Id*.

1.      **Union-VCS communications**

Beginning in March 2017, representatives of the Union contacted the VCS executive director Sandi Strother in Missouri and members of VCS across the country, encouraging VCS to reconsider its decision to hold the 2018 mid-year conference at the Anchorage Hilton.[29]  These contacts included phone calls, emails, and letters.[30]  The communications were directed to Ms. Strother, the eight volunteer members of the executive board that governs VCS, and VCS members.  Eventually, the Union emailed the conference's keynote speaker as well.[31]  Overall, the Union emailed the same letter four times to the members of VCS board[32] and mailed one copy of the same letter to all VCS members via U.S. Mail.[33]  Emails from Union representatives contained an "unsubscribe" link which would remove the recipient from future Union emails, although Hilton notes that none of the recipients had ever subscribed to these mailing lists in the first place.[34]

Hilton alleges that the conduct of the callers was bothersome.  The Union phoned recipients' office and personal cell phone numbers.[35]  The Union made a single

---

[29]  *Id*. at 4; Dockets 52-1 at 3–4.
[30]  *See* Docket 52; Docket 103 at 10.
[31]  Dockets 52 at 4; 139 at 33.
[32]  *See* Docket 139 at 7, 27.
[33]  Dockets 136 at 4–5; 138 at 1–2; 139 at 32–33.  *See also* Docket 146 at 13.
[34]  Docket 136 at 4; *see, e.g.*, Docket 105 at 4 (Ms. Hickok's declaration that she never "subscribed" to Union emails and had to send a request to unsubscribe).
[35]  Docket 103 at 10.

round[36] of 450 phone calls to VCS members.[37]  However, certain veterinary practices received multiple calls during this single round.[38]

In addition, Hilton also asserts that the callers were at times aggressive and rude, refusing to give up when the VCS members said they were not attending the conference, or when the veterinarians tried to interrupt their "clearly scripted speech."[39]  At least one organizer called a VCS member back immediately after the VCS member ended the first call.[40]  The Union admits that callers would call back a single time after a hang-up or phone disconnection, but claimed that this was for the purpose of leaving a message.[41]

After the calling campaign, dozens of VCS members contacted Ms. Strother to discuss their concerns about the 2018 mid-year conference and to ask the VCS to remove their contact information from the VCS website.[42]

---

[36] Docket 138 at 5.

[37] *See* Docket 93-2 at 6 (stating that some ten callers made 450 calls in November 2017).

[38] Docket 103 at 11–12 (Hilton stating that Union organizers made repeated phone calls to individual veterinary practices to reach multiple VCS members who worked at the same clinic.).

[39] Dockets 103 at 12, 13; 104-2 at 1–2, 13.

[40] Docket 136 at 3.

[41] Docket 138 at 5.  And, Hilton complains, a hang-up would not remove a recipient from future call lists.  Docket 136 at 4.  Only an explicit statement such as "do not call me anymore" would cause the Union representative to note that request.  *Id.*  Even then, the recipient would still remain on the Union's emailing or mailing lists.  *Id.*  However, Audrey Saylor testified that she did not have e-mail addresses for VCS members other than board members.  Docket 139 at 33.  The Union reasons that since they only made one round of calls and sent no emails to VCS members, there was no opportunity for a pattern of harassing communications to develop.  Therefore, their method of removing members from their contact lists should not be at issue here.  Docket 138 at 7.

[42] Docket 52 at 4.

## 2. Misleading messaging

The contents of these communications often alleged health and safety issues at Hilton, as well as information about the Union's dispute with the Hilton.[43] For example, the March 22, 2017, email to Ms. Strother listed mold and other OSHA issues with the hotel.[44] The Union has provided numerous documents affirming that mold and OSHA issues did exist at the hotel, establishing that therefore the Union's statements about the issues technically were accurate.[45] Hilton objects, however, that these communications failed to paint a complete picture, as they declined to mention contemporaneous positive OSHA inspection reports and focused on the negative.[46]

Additionally, Hilton alleges other instances of misleading speech relating to asbestos and lead contamination, theft from the hotel property and reports of police activity, rodents, treatment of workers, and whether organized hotel workers even still supported the boycott in 2017.[47] For example, the Union's phone bankers' script "focused on the 2017 firing of an employee . . . after he had taken pictures of [] mold."[48] Hilton asserts that this is misleading because the employee was in fact fired for not reporting mold to hotel management.[49] In briefing, Hilton acknowledges that the callers' "rap" contained a note

---

[43] Docket 103 at 10.
[44] *Id.*
[45] *See* Docket 140 at 1–8 (Marvin Jones' Declaration, supported by over 100 pages of attached exhibits).
[46] Docket 103 at 10.
[47] Docket 136 at 5–6.
[48] *Id.* at 2.
[49] *Id.*

explaining Hilton's view that the employee was fired for failing to report mold.[50]  There is no indication that any caller ever broached the topic of the employee's termination with a VCS member, however.[51]

The Union's website hiltonanchoragemoldreport.org also includes information about this incident, and, according to Hilton, contained "outdated information about rodents."[52]  Many of the Union's communications refer listeners and readers to their website.  The Union alleges that statements made about asbestos, lead, rodents, and police reports were accurate and based upon hotel records and public records.[53]

### 3. Deliberate falsehoods

Hilton regards some of the messages the Union communicated as intentionally false and misleading.[54]  Hilton alleges that Ms. Strother reported that veterinarian members told her that in early November 2017, VCS members received phone calls from a representative of the Union who was fraudulently posing as Dr. Lisa Parshley, the scientific program chair for the VCS 2018 mid-year conference, and informing VCS members that Dr. Parshley had canceled the mid-year conference as a result of the problems at the Anchorage Hilton.[55]  Dr. Parshley told Ms. Strother she made no such calls.[56]  Union representatives Carlos Cruz and Sana Siddiq provided declarations acknowledging calling

---

[50]  *Id.* at 2–3.
[51]  Docket 138 at 10–11.
[52]  Docket 136 at 6.
[53]  Docket 138 at 10–13.
[54]  Docket 103 at 12.
[55]  Dockets 52 at 4; 52-1 at 6–7; 103 at 12–13.
[56]  Docket 52-1 at 6–7 (Ms. Strother reporting that Dr. Parshley denied making calls).

those members, although they declare that they stated who they were straightforwardly and left messages for the recipients to call Dr. Parshley at her phone number to urge her to cancel the conference.[57]

### 4. In-person Union activities

The Union leafleted at VCS member practices in Las Vegas and in Maryland.[58] In Towson, Maryland, organizers distributed flyers to pet owners bringing their pets to a clinic.[59] Hilton takes issue mainly with the content of the communication, as it does not allege secondary picketing at this venue. The flyers showed a photo of a "Sad Puppy" surrounded by phrases describing the various grievances the Union had with Hilton, such as "AK OSHA Citations and Fines?"; "A history of mold & water leaks?"; and "No wage increases in 9 years?", and listing the Anchorage Hilton Mold Report website.[60] The text at the bottom of the flyer encouraged pet owners to ask their veterinarian to "tell the Veterinary Cancer Society to move their conference out of the Hilton Anchorage and into a hotel that respects workers!"[61] and directed recipients to contact Program Chair Dr. Parshley, or Audrey Saylor at Unite Here Local 878.[62] Distributed along with the flyer was a one-page letter from Ms. Saylor that detailed "some facts that we suspect the hotel didn't tell you when you booked your event."[63]

---

[57] Docket 103 at 12–13.
[58] Docket 136 at 6. There are no details about the Las Vegas leafleting activity in the parties' summary judgment briefing, and we do not discuss it here.
[59] Docket 103 at 13.
[60] Docket 104-2 at 15.
[61] *Id.*; *see* Docket 104-2 at 14–16.
[62] Docket 104-2 at 15.
[63] *Id.* at 16.

Hilton did not allege that the leafleting activity in Towson was loud, violent, blocked entrances, or that it involved picketing, patrolling, trespassing or numerous Union representatives, or that it was confrontational in any way with the consumers of the VCS member clinic.[64]

### 5. Damages

The week organizers visited the Towson, Maryland, clinic, VCS President Kim Selting broke VCS's contract with Hilton for the 2018 mid-year conference.[65] Hilton alleges that the Union's actions "were intended to harass and intimidate the VCS and its members."[66] Hilton alleges a loss of at least $39,130 in conference-related revenue due to the cancellation.[67] VCS moved their mid-year conference to the Anchorage Marriott, a property which ultimately, through numerous corporations, is owned by the same parent company that owns the Anchorage Hilton, CSC Holdings, LLC.[68] Hilton further alleges that conference registrations were reduced by the Union activities, and that VCS reduced their room commitments accordingly, such that the Marriott contract was worth $11,000 less than the original Hilton contract.[69]

---

[64] *See, e.g.*, Dockets 136, 103.
[65] Docket 104-2 at 17–19.
[66] Docket 1 at 5.
[67] Docket 103 at 14.
[68] *Id.* at 14–15. However, the parent company is not a party to the litigation, and CP Anchorage Hotel 2, LLC, alleges they received no financial benefit from the VCS-Marriott contract. *Id.* at 15.
[69] *Id.*

## B.    Facts Regarding AK-SHRM

The Alaska affiliate of the Society for Human Resource Management State Council ("AK-SHRM") is a tax-exempt organization associated with the national Society of Human Resource Managers ("SHRM") and the Northwest Human Resource Management Association.[70]  AK-SHRM sponsors the Alaska State HR Conference.[71]  The 2018 Conference was scheduled at the Anchorage Hilton in the fall,[72] after AK-SHRM contracted with the Hilton in May 2017.

### 1.    AK-SHRM calls, emails, and social media communications

Defendants called and emailed various HR personnel to advise them about the labor dispute against Hilton and to try to have the AK-SHRM conference moved from the hotel.[73]  On February 21, 2018, the Union sent an initial email to AK-SHRM's volunteer executive board asking them to boycott the hotel.[74]  Defendants also emailed individuals volunteering at, or members of, other State SHRM councils.[75]  The Union also emailed conference speakers, apparently after independently researching their contact information.[76]

Hilton particularly complains that the Union tactically "single[d]-out individuals at their places of employment, and then contact[ed] their supervisors or

---

[70] Docket 52 at 5.
[71] *Id.*
[72] *Id.*
[73] *Id*.
[74] Docket 103 at 17.
[75] Dockets 52 at 6; 103 at 17–18.
[76] Docket 103 at 19.

coworkers" who were not associated with AK-SHRM, resulting in hassle and embarrassment to those individuals.[77]  The AK-SHRM volunteer Executive Director, Ben Krisher, coordinated "his company's IT department to block Defendants' emails to his boss and company owners."[78]  In tweets, Defendants posted about their labor disputes with Hilton, and tagged some of these third-parties.[79]  Hilton alleges that the Union communications had impact "not because of the message they were spreading, but because of the insidious way they spread it . . . who and how they were contacting, not what they were saying."[80]

Furthermore, Hilton alleges that Union callers to AK-SHRM members were similarly pushy and belligerent as in some calls to VCS members, discussed *supra*.[81]

## 2. In-person Union activities

In August 2018, Union representatives protested or handed out flyers at approximately nine[82] companies employing board members of both AK-SHRM and board members of another—unrelated—organization, the Anchorage Chapter of the Society of Human Resource Managers ("Anchorage SHRM").[83]  The Anchorage SHRM board members were not organizers for the Alaska State HR Conference.[84]

---

[77] *Id*. at 18; *see* Docket 52 at 6–7.
[78] Docket 103 at 18.
[79] Docket 52 at 7.
[80] Docket 103 at 18–19.
[81] *Id*. at 19.
[82] Docket 93-2 at 10.
[83] Docket 52 at 6, 5.
[84] *Id*. at 6.

At the Anchorage Museum, Union representatives handed out flyers announcing that an AK-SHRM volunteer board member who worked there, Ann Kjera, refused to boycott the Hotel. Ms. Kjera did not have the authority to move the conference.[85] The flyers contained Ms. Kjera's work-related contact information.[86] At NANA Alaska Native Corporation, Union representatives handed out flyers printed with AK-SHRM board member and NANA employee Patty Hickok's personal email address and Twitter handle.[87] Ms. Hickok had to take time from her workday to explain to her colleagues what was happening.[88] Union representatives also leafleted at the Cook Inlet Housing Authority on September 10, 2018, while Anchorage SHRM, the unrelated entity, hosted an educational test preparation course, even though there was no evidence that any course participants were registered to attend the conference at the Hilton.[89] These leaflets contained AK-SHRM's Executive Director Krisher's personal cell phone number and other contact information.[90] Overall, Ms. Saylor estimated that they printed approximately 15 flyers on average for each of the leafleting locations, and that they did not give out that many.[91] Plaintiff does not explicitly allege that any of the above hand-billing activities involved picketing, patrolling, blocking ingress or egress of customers, or any like circumstances.

---

[85] Docket 103 at 19.
[86] *Id.*
[87] *Id.* at 20.
[88] *Id.*
[89] Dockets 52 at 6; 103 at 20.
[90] Docket 103 at 20.
[91] Docket 152-2 at 5.

### 3. Denali Federal Credit Union

However, Hilton highlighted one instance of Union activity, at Denali Federal Credit Union ("Denali FCU") on August 20, 2018, that Hilton contends creates a material issue of fact with regard to "the nature and impact of the Defendants' conduct."[92] Plaintiff has provided four photographs that show the Union activity, and submitted deposition testimony from Ms. Saylor that explains the event.[93] Hilton contends that these photographs depict the Union obstructing the entrance of Denali FCU and harassment of Denali FCU customers in violation of section 8(b)(4)(ii)(B) of the NLRA—in other words, conduct more coercive than just leafleting or hand-billing.[94]

The photographs depict three Union interns[95] standing near Denali FCU's entrance: (1) in the parking lot in front of the entrance doors;[96] (2) to the viewer's right of the entrance on the sidewalk, interacting with a person walking towards the entrance;[97] and (3) to the viewer's left of the Denali FCU ATM, which is further to the left of the entrance doors.[98] Ms. Saylor testified that, prior to the event, the interns were trained in the rules of leafleting: "not blocking people's way, not being aggressive, not blocking entrances."[99]

---

[92] Dockets 152 at 2–3; 156 at 2.
[93] *See* Dockets 152-1; 152-2; 152 at 2.
[94] Docket 152 at 2–3.
[95] *See* Docket 152-2 at 1 (describing interns' training and the reason for photographing them).
[96] Docket 152-1 at 1, 2.
[97] *Id.* at 3.
[98] *Id.* at 4.
[99] Docket 152-2 at 1.

She testified that the interns were near the Denali FCU entrance, but were not blocking the entrance.[100]  Plaintiffs disagree, relying on the photos they submitted.[101]

TJ Alinen, Vice President for Human Resources at Denali FCU, was an AK-SHRM volunteer board member at the time.[102]  The Union interns handed out flyers naming Mr. Alinen and posting his contact information, encouraging the reader to "Ask him to support workers!"[103]  One witness familiar with Mr. Alinen later surmised that the Union activity was one factor in causing Mr. Alinen to leave the board of AK-SHRM, although there is no indication that Mr. Alinen stated so explicitly.[104]

### 4. Damages

Hilton alleges that whether they suffered damages as a result of the Union activity is disputed, despite the fact that the AK-SHRM 2018 conference was "sold out" and was held at the Hilton as planned.  Hilton lists two reasons.  First, in 2017, Northrim Bank and Denali FCU sponsored the AK-SHRM conference, but they did not appear as sponsors in 2018.[105]  Both entities received communications from the Union in 2018.[106]  A review of the sponsor and exhibitor lists, however, indicates that only Northrim Benefits Group was a 2017 sponsor and exhibitor; Denali FCU was a 2017 exhibitor, but not a sponsor.[107]  The 2018 Conference hosted one less unique exhibitor (13, rather than 14 in

---

[100]  *Id.* at 2.
[101]  Docket 152 at 2; *see also* Docket 157.
[102]  Docket 103 at 21.
[103]  Docket 104-4 at 7.
[104]  Dockets 103 at 21; 104-3 at 34; *see* Docket 113 at 10–11.
[105]  Docket 103 at 35.
[106]  *Id.*
[107]  Docket 104-4 at 8.

2017) and the same number of platinum, gold, and silver sponsors as in 2017.[108]  Many of the 2017 sponsors and exhibitors did not return to the 2018 conference, but they were largely replaced by new companies.[109]  Second, AK-SHRM "put out a bid for its next conference rather than immediately sign a contract with the Anchorage Hilton."[110]  After negotiations, AK-SHRM did sign a conference contract with Hilton for its next conference, in 2020.[111]  However, there is no dispute that the 2020 conference was cancelled due to the COVID-19 pandemic.[112]

## IV.   APPLICABLE LAW

### A.   Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[113]  The burden is on the moving party to establish the absence of a genuine dispute of material fact.[114]  The Court must view the evidence in the light most favorable to the nonmoving party.[115]  Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of

---

[108]  *See id*. at 8, 9.
[109]  *See id*.
[110]  Docket 103 at 35.
[111]  *Id*.
[112]  *Id*. at 22; Docket 113 at 18 n.80.
[113]  Fed. R. Civ. P. 56(a).
[114]  *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).
[115]  *Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir. 1999) (*en banc*).

evidence in support of the plaintiff's position [is] insufficient . . . ."[116]  If, at trial, the nonmoving party would bear the burden of proof, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case."[117]  Then, the burden shifts to the nonmoving party to show "specific facts demonstrating the existence of genuine issues for trial."[118]  This burden is not a light one.[119]  The nonmoving party's evidence must be "significantly probative," that is, more than "merely colorable," to survive summary judgment.[120]  In this analysis, reasonable inferences should be drawn in the nonmoving party's favor.[121]  If the nonmoving party submits sufficient evidence that "a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not," summary judgment must be denied.[122]

## B.  NLRA Section 8(b)(4)(ii)(B) and LMRA Section 303

National Labor Relations Act § 8(b)(4)(ii)(B), or 29 U.S.C. § 158(b)(4)(ii)(B), describes as an unfair labor practice any action to "threaten, coerce, or restrain any person engaged in commerce . . . where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person."[123]  Such conduct, with the requisite

---

[116] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986).
[117] *In re Oracle Corp. Sec. Litig.,* 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).
[118] *Id.*
[119] *Id.*
[120] *Blake v. Guthy-Renker, LLC*, 965 F. Supp. 2d 1076, 1081 (D. Alaska 2013).
[121] *Oracle,* 627 F.3d at 387 (citations omitted).
[122] *Liberty Lobby*, 477 U.S. at 254.
[123] 29 U.S.C. § 158(b)(4)(ii)(B); *see also* Catherine L. Fisk, The Once and Future Countervailing Power of Labor, 130 Yale L.J.F. 685, 705 n.85 (2021).

intent, is regarded as impermissible secondary boycotting, being "directed at parties who are not involved in the labor dispute."[124] Section 8(b)(4)(ii)(B) proscribes the creation of "a separate dispute with the secondary employer" in order to coerce the primary employer.[125] Section 8(b)(4)(ii)(B) does not preclude picketing that results in an "incidental injury to the neutral [parties]," so long as the picketing was not "reasonably calculated to induce customers not to patronize the neutral parties at all."[126]

The focus of § 8(b)(4)(ii)(B) regulates conduct rather than content.[127] Section 8(b)(4)(ii)(B), along with § 303 of the LMRA, specifically prohibits "threatening, coercing, or restraining any person engaged in commerce."[128] The First Amendment does not afford unbridled protection to forms of harassing and intimidating conduct.[129] But to the extent that the statute's terms of "threats, coercion, or restraints" are "nonspecific, indeed vague," the United States Supreme Court has held that they may raise "serious questions about the validity of § 8(b)(4) under the First Amendment."[130] These terms are to be interpreted with "caution" and not given a "broad sweep."[131]

---

[124] *See Retail Property Trust v. United Bhd. of Carpenters & Joiners of America*, 768 F.3d 938, 943 (9th Cir. 2014).
[125] *N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Local 760 (Tree Fruits)*, 377 U.S. 58, 72 (1964); *see also Constar, Inc. v. Plumbers Local 447*, 748 F.2d 520, 521 (9th Cir. 1984).
[126] *N.L.R.B. v. Retail Store Emp. Union, Local 1001 (Safeco)*, 447 U.S. 607, 614 (1980) (citation omitted).
[127] *Retail Prop. Trust*, 768 F.3d at 943 (citations, alterations and internal quotation marks omitted).
[128] *Id.*
[129] *See* O'Brien v. Welty, 818 F.3d 920, 930 (9th Cir. 2016).
[130] *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 578, 575 (1988).
[131] *Id.* at 578 (citation omitted).

Section 303 of the LMRA allows damages recovery for a violation of § 8(b)(4) of the NLRA.[132]

## C.    Defamation

To bring a successful state-law defamation claim as part of a labor dispute, the plaintiff must establish:  (1) the statement asserts or implies an objective fact, (2) the factual assertion is false, and (3) the speaker published the fact with "actual malice."[133]

## V.    DISCUSSION

The purpose of § 8(b)(4)(ii)(B) is to protect neutral parties from coercive secondary boycotts by a union.[134]  The issue for the Court to decide is whether evidence, when viewed in the light most favorable to the nonmoving party, exists such that a reasonable trier of fact could conclude that any of Defendants' actions were threatening, coercive, restraining, or defamatory—and whether those actions caused damages to Plaintiff—within the framework of the NLRA and labor laws.

The NLRA is two-pronged, requiring both an act that threatens, coerces, or restrains, and "an object," or intent.[135]  Here, the Union admits their intent was to discourage VCS and AK-SHRM from doing business with Hilton.[136]  As in *Overstreet v.*

---

[132] 29 U.S.C. § 187.
[133] *Steam Press Holdings, Inc. v. Haw. Teamsters, Local 996*, 302 F.3d 998, 1004 (9th Cir. 2002).
[134] *Laborers' Pension Fund v. Murphy Paving & Sealcoating, Inc.*, 450 F. Supp. 3d 815, 829 (N.D. Ill. 2020) (citing *520 S. Michigan Ave. Assocs., Ltd. v. Unite Here Local 1*, 760 F.3d 708, 719 (7th Cir. 2014)).
[135] *See* § 8(b)(4).
[136] Docket 93 at 24.

*United Brotherhood of Carpenters and Joiners of American, Local Union No. 1506*,[137] the Court shall therefore focus on the "threaten, coerce, or restrain" aspect of § 8(b)(4). Using this framework, this analysis examines the Union's phone calls and messages, email messages, postal letters, Twitter messages, hand-billing and leafleting, and the conduct therein, for potential violations of § 8(b)(4).

A.  **The Union's Phone, Email, Mail, or Social Media Communications Did Not Threaten, Coerce, or Restrain any Person in Violation of § 8(b)(4) as a Matter of Law**

Labor unions can use peaceful persuasive techniques to encourage a consumer boycott of a third-party neutral entity.[138] A union "can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site."[139] Communications such as letters have "even fewer potentially coercive, threatening, or restraining characteristics than [do] even hand-billing or other in-person communication."[140] The Supreme Court in *DeBartolo* was concerned that proscribing peaceful hand-billing, where the handbills truthfully described a labor dispute, would raise serious First Amendment issues.[141]

---

[137]  409 F.3d 1199 (9th Cir. 2005).
[138]  *See DeBartolo*, 485 U.S. at 583–84.
[139]  *Id*. at 586–87.
[140]  *George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 391–92 (5th Cir. 1999) (noting that letter communications in other contexts enjoy greater First Amendment protection and citing *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 475–76 (1988)).
[141]  *DeBartolo*, 485 U.S. at 575.

Picketing, on the other hand, is prohibited because it is "a mixture of conduct and communication."[142]  Picketing's "classic example"[143] of coercive conduct, to include patrolling, marching, violence, masses of people, carrying signs and placards, chanting, following customers, physically blocking entrances, etc., is the coercive element that is the "most persuasive deterrent to third persons about to enter a business."[144]  "[P]icketing is qualitatively 'different from other modes of communication.'"[145]

An out-of-circuit court has found that whether a union uses coercive conduct can be decided as a matter of law.[146]  This Court agrees.  Reviewing each of the following actions and patterns, the Court can determine whether any of Defendants' activities involved "threat, coercion, or restraint."  The related consideration is whether Defendant's activities were speech, conduct, or a mixture of both.  Speech, even when unpopular, is protected under the First Amendment, even in the labor dispute context.  Only when the manner of union communications could be considered "threat, coercion, or restraint" is the speech in violation of § 8(b)(4).

Many cases have considered various forms of union activity and have found them either to be protected speech tactics or coercive conduct that could constitute a

---

[142] *Id*. at 580 (citing *Safeco*, 447 U.S. at 619 (Stevens, J., concurring)).

[143] *Ameristar Casino E. Chicago, LLC v. UNITED HERE Loc. 1*, No. 16 CV 5379, 2018 WL 4052150, at *4 (N.D. Ill. Aug. 24, 2018) (citing *Safeco*, 447 U.S. at 612, in commenting that § 8(b)(4) was enacted to ban the "isolated evil" of secondary picketing).

[144] *DeBartolo*, 485 U.S. at 580 (citing *Safeco*, 447 U.S. at 619 (Stevens, J., concurring)); *see Overstreet*, 409 F.3d at 1210; *Storer Commc'ns, Inc. v. Nat'l Ass'n of Broad. Emps. & Technicians, AFL-CIO*, 854 F.2d 144, 147 (6th Cir. 1988).

[145] *DeBartolo*, 485 U.S. at 580 (citation omitted).

[146] *Ameristar*, 2018 WL 4052150, at *5 (citing *520 S. Michigan Ave.*, 760 F.3d at 725–28).

violation of § 8(b). This Court itself previously has found that the Union's website and other social media campaigning are not coercive or harassing conduct.[147] Furthermore, generally emails and letters are one-on-one protected speech, and not coercive. Phone calls and messages can be harassing, should the act of calling run afoul of state harassment statutes. Secondary hand-billing is a protected activity, but some forms of hand-billing and leafleting can rise to the level of picketing if certain conduct elements are present.

### 1. Union emails, tweets, and mailed letters

Although Hilton complains that repeated emails directed to VCS or AK-SHRM were unwanted and inundating, this Court can find no authority that would suggest the Union's sending of these emails was coercive or otherwise a violation of § 8(b)(4). The emails themselves did not contain threats. Yet Hilton alleges that either the emails' content (of focusing on hotel problems such as mold and OSHA violations), or the numerosity of the emails when sent to small non-profit organizations constituted violations of § 8(b)(4).

Hilton contends that the Union's reliance on statements that were misleading are evidence that the content of the Union's speech was not meant to educate, but "to scare potential attendees away."[148] But the Ninth Circuit has noted "the concepts of fraud and misrepresentation, on the one hand, and threats, restraints, and coercion, on the other, appear quite separate."[149] Just as the Ninth Circuit held in *Overstreet*, there is no need to reach the issue here of whether "false speech, without more, can violate § 8(b)(4)(ii)(B)"

---

[147] Docket 51 at 3.
[148] Docket 136 at 10.
[149] *Overstreet*, 409 F.3d at 1217 n.20.

because the Union here has provided plentiful documentation that their messaging in letters and emails contain truthful statements that are well-supported by information received from Hilton itself.[150] Therefore, emails and letters could only violate § 8(b)(4) if the conduct involved in sending them could be found to be threatening, coercive, or restraining.

At VCS, Ms. Strother complained that she received so many messages *from her members* about the Union activity that it affected her ability to do other aspects of her job.[151] Ms. Strother did not receive many communications from the Union.[152] The Union sent no more than four emails to VCS's executive board over six months, and they mailed one letter to VCS members at their postal addresses.[153] Ms. Strother testified that she only heard members had received emails, but this testimony is contradicted by her prior written statement that she had heard "NO ONE say that they received an email."[154] Even if VCS members had received some emails from the Union, there is no evidence to establish that the Union's emailed messages were so numerous as to constitute harassment. Further, emails contained an "unsubscribe" link, and, as such, any recipient could choose to unsubscribe after one email, or at any time they considered the contact annoying or disruptive, let alone harassing.

---

150 *Id.*; *see supra* n.45.
151 Dockets 52-1 at 5; 104-1 at 27, 46, 54–55. Even so, the manner in which speech affects the listener cannot contribute to a violation of § 8(b)(4). Even the "emotive impact of speech on its audience" is protected. *Overstreet*, 409 F.3d at 1212 (citation omitted).
152 Docket 104-1 at 48.
153 Docket 113 at 6–7. *See supra* n.32.
154 Docket 113 at 7 n.8.

The same analysis applies for the relatively small number of email messages the union sent to AK-SHRM volunteers, members, and other recipients.[155] Numbers aside, Hilton complains mainly about the Union's selection of email addressees regarding the AK-SHRM conference. Hilton claims that several AK-SHRM board members were embarrassed, inconvenienced, or feared for their job security because the Union had located email addresses for the AK-SHRM board members' co-workers or bosses and emailed them. Two board members provided declarations or deposition testimony about these concerns.[156] But Hilton provides no authority that any email to any recipient, even someone only distantly related to a secondary consumer, could be a § 8(b)(4) violation.

Hilton also argues that social media and other communications were unlawful because they occasionally used personal contact information and Twitter handles for the people the Union tried to reach. Yet this Court can find no authority that the Union is prohibited from sending an email, tweet, or letter to anyone for whom it found an address. The Union messages were not threatening and they were not so numerous to rise to the level of interfering with servers and the capacity to deliver other messages. And, social media messages "pose very little risk of harming an unwilling or captive listener; after all,

---

[155] Docket 138 at 5 ("Defendants sent a total of seven emails either to the Board or to persons who Defendants thought might be able to persuade the Board" over the course of their campaign).

[156] Dockets 104-3 at 31–33; 106 at 3, 7–11. Patty Hickok also declared that the Union activity was disruptive to her co-workers and she had to explain her AK-SHRM volunteer involvement to her supervisors, causing her stress that her employer would develop a negative view of her. The Union activity she mentions was hand-billing at her place of business, not email messages. Docket 105 at 3.

anyone can unsubscribe from Twitter."[157]  On these facts, it would be impossible to find the Union's methods of emailing or using social media to be an unfair labor practice.

### 2.    Union phone calls, messages

Hilton argues that Union representatives placed unwanted calls to VCS and AK-SHRM members, and that these callers could be aggressive and rude, unwilling to listen while they insistently stuck to their Union script.  Callers would sometimes call back immediately after a phone call had been "disconnected"—at least occasionally, after a recipient had hung up on the caller.  Hilton argues that callers placed multiple calls to the same number, although this seems to be an attempt to reach multiple VCS members who share a practice.  Yet none of these allegations, if true, could support a finding of a § 8(b)(4) violation.

The Union argues that the reasoning in *520 S. Michigan Ave.* relating to phone calls can be distinguished from the reasoning related to (and prohibiting) other more coercive activities.  In that case, leaving messages until a voicemail was full was not found to be a violation of § 8(b)(4); nor was a situation where the Union telephone caller had a "screaming match" with the president of a third-party organization.[158]

Telephone harassment in the Ninth Circuit and in Alaska is limited to those instances of multiple repeated calls, often at "inconvenient hours" that have the effect of

---

[157] *520 S. Michigan Ave.*, 760 F.3d at 727–28.
[158] *Id.* at 728, 714, 727.

blocking the recipient from using their phone.[159]  In the Seventh Circuit, phone calls to

people's homes could be coercive if they were frequent and repeated.[160]  Defendants state

that "no court has ever held that calling a professional office 'multiple times in a day'

violates § 8(b)(4)," nor has this Court been able to find such a case.[161]  Here, Plaintiff fails

to allege facts that could support a finding of telephone harassment or coercive calls.

With respect to calls made to VCS, Hilton specifically alleges an instance of

defamatory speech, and this is discussed in section **V. (C).**, *infra*.

## B.  The Union's Hand-Billing Activities were Lawful as a Matter of Law

The difference between permissible hand-billing and prohibited secondary

picketing is that persuasion is allowed, while threat, coercion or restraint is not.[162]

The Union contends, that, as a matter of law, its in-person activities were

permissible.  The argument follows that their communications did not "threaten, coerce, or

restrain" Hilton's customers as a matter of law.  The Union does not dispute that their aim

was to persuade VCS and AK-SHRM to stop doing business with Hilton in support of their

boycott.  They argue that it does not matter that the recipients of the messages were

annoyed or burdened by the conduct because the conduct contained speech and was not

coercive.[163]

---

[159]  Alaska Stat. § 11.61.120(a)(2)–(3).  This statute outlaws a single telephone call under
subsection (a)(4) only if the content contained a threat.

[160]  *520 S. Michigan Ave.*, 760 F.3d at 721.

[161]  Docket 113 at 8 n.14.

[162]  *Safeco*, 447 U.S. at 619; *see also DeBartolo*, 485 U.S. at 580 ("The loss of customers
because they read a handbill urging them not to patronize a business, and not because they are
intimidated by a line of picketers, is the result of mere persuasion.").

[163]  *520 S. Michigan Ave.*, 760 F.3d at 726, 727.

As the court in *520 S. Michigan Ave*. stated:

> To put the matter simply, and perhaps too simply, the central question in this case is therefore whether the Union's conduct in this case is coercive, as in the sense of a boycott or picket, or persuasive, as in the case of handbilling outside an establishment. Of course, reality is not so easily divided into two neat categories, and we may find that certain aspects of the Union's conduct could be persuasive or coercive in ways that distinguish it from both handbilling and picketing.[164]

Hand-billing directed at secondary actors "may potentially fall under the ambit of [§ 8(b)(4)] if it is substantially similar to picketing and sufficiently coercive."[165] In the Ninth Circuit, case law limits § 8(b)(4) violations to ambulatory picketing.[166] When there are no "threats," no physical barriers or "restraints," and no "coercion," Hilton cannot prove as a matter of law that the Union violated § 8(b)(4).[167]

### 1. Union in-person leafleting in Maryland (VCS)

Hilton argues that the Union's hand-billing activity at a VCS member clinic in Towson, Maryland, was unlawful, focusing on the sad puppy image on the handbill as something that would mislead or upset consumers who were bringing their animals to the veterinarian. Yet Hilton provided no evidence contesting that the leafleting was peaceful—the VCS member who worked there declared that he did not recall "hearing of any complaint by clients about the leafleting nor . . . perceiving any disruption to the operations

---

[164] *Id.* at 720.
[165] *Id.* at 722.
[166] *Overstreet*, 409 F.3d at 1212 (citing *DeBartolo*, 485 U.S. at 587).
[167] *See id*. at 1213.

of the facility."[168]   The two Union leafleters present provided declarations containing details about their activity.  Union representatives did not carry signs.  They were not loud.  When they were asked to move across the parking area, they did so immediately.[169]  Police were not called.[170]

Because speech is protected, regardless of the effect on the listener, the "sad puppy" content of the flyer cannot be considered coercive.[171]  This peaceful hand-billing event cannot be found to give rise to a § 8(b)(4) violation.

### 2.    Union in-person leafleting in Anchorage (AK-SHRM)

Similarly, most of the Union hand-billing activity in Anchorage directed at AK-SHRM board executives and members was peaceful.  At only one location did Hilton provide evidence of coercive conduct at a leafleting event, although Hilton claims it did so to establish a genuine dispute of material fact on the entire "topic" of the manner in which the leafleting was conducted at all third-party businesses.[172]  Although Hilton characterizes perhaps all of the hand-billing events as disruptive, as opposed to the "peaceful and non-disruptive displays of banners" that the Ninth Circuit has allowed, disruption is not the standard.  While "peaceful activists making fervent efforts to pass out handbills directly in front of a building could create a symbolic barrier . . . such activity would presumably be

---

[168]  Docket 93-1 at 145.
[169]  Docket 93-4 at 5–6.
[170]  Docket 93-5 at 4.
[171]  *Overstreet*, 409 F.3d at 1212.
[172]  Docket 152 at 2.

legal under *DeBartolo*."[173]  The presence of Union members outside a business does not equate to blocking of entrances under *DeBartolo*.[174]

One district court in this circuit has interpreted *Overstreet* to find a possible violation of the NLRA when a union argued it was merely hand-billing.  In *Premier Floor Care Inc. v. Serv. Emps. Int'l Union, United Serv. Workers W.* (*Premier*),[175] union members created physical barriers, surrounded the perimeter of a secondary business (a Safeway store), entered the store, chanted through bullhorns, drummed, carried signs, caused the store to call the police, and made it "impossible for customers to shop."[176] Where colorable evidence of this kind of activity exists, there is a question whether Union activity violates the NLRA.  On the other hand, when there is "no violence, picketing, or patrolling and only an attempt to persuade," there is no § 8(b)(4) violation.[177]

In Hilton's photographic evidence, Union interns are pictured carrying handbills and approaching Denali FCU customers from the parking lot and sidewalk outside the entrance,[178] in an effort to encourage AK-SHRM board member and Denali FCU employee TJ Alinen to move the 2018 conference.

Hilton aims to allege a triable issue of fact that the interns' event at Denali FCU blocked entrances or otherwise threatened, coerced, or restrained customers.  But the

---

[173]  *See Gold v. Mid-Atl. Reg'l Council of Carpenters*, 407 F. Supp. 2d 719, 727–28 (D. Md. 2005).

[174]  *Id*. at 726–27 (citing *Overstreet,* 409 F.3d at 1211).

[175]  No. 18-CV-018510-HSG, 2019 WL 2635540, at *6 (N.D. Cal. June 27, 2019).

[176]  *Id*. at *6.

[177]  *DeBartolo*, 485 U.S. at 578.

[178]  Docket 152-1.

four photographs, without more, cannot establish that the three Union interns blocked anyone from entering the business. The middle intern stands within a parking space, no more blocking the central path to the entrance than a legally parked car.[179] Further, there is no evidence that the interaction on the sidewalk to the right was coercive, and it would not be justifiable, in light of Ms. Saylor's testimony that the interns were not aggressive on that day and that they were in fact trained *not* to be aggressive,[180] to infer coercion.[181]

The Court is required to draw all reasonable inferences in favor of the nonmoving party. The evidence of the nonmoving party is to be believed.[182] But the argument of a party can be separately and critically examined. The photographs of three interns outside Denali FCU are a mere "scintilla" of evidence of coercion.[183] The images are not significantly probative because the optics of the photographic evidence, without more, are consistent with peaceful hand-billing. Hilton's additional evidence about the hand-billing do not include any testimony or declarations describing the Union interns' conduct. For example, the declarations of Ann Kjera and Patty Hickok include descriptions of hand-billing at their places of employment, and the harassment they felt, but they do not indicate that Union members engaged in any coercive conduct such as blocking entrances,

---

[179] *Id.* at 1–2, 3.
[180] *See* Docket 152-2 at 1, 4.
[181] *See* Docket 152-1 at 3.
[182] *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (citation omitted).
[183] *See, e.g.*, *Liberty Lobby*, 477 U.S. at 252.

carrying placards, using bullhorns, marching back and forth, and the like.[184]  The photos
are consistent with Ms. Saylor's declaration and deposition statements that the interns did
not march back and forth, carry signs, or block doors.[185]  Hilton has failed to produce
probative evidence to support its interpretation of the photographs as depicting a
"triangular phalanx" as opposed to three people peaceably hand-billing.  Because it is the
element of confrontation that is important, rather than the distance from the entrance,
Hilton has failed to adduce any evidence that the leafleting events were confrontational.[186]

## C. There is no Admissible Evidence to Support Plaintiff's Defamation Claim

The parties dispute whether one of the Union's representatives impersonated
the VCS midyear conference's scientific program chair, Dr. Lisa Parshley in November
2017.  They dispute whether the caller falsely stated that the conference was cancelled to
VCS members.  Hilton can survive summary judgment on its defamation claim if it can
present evidence that the Union made a statement that asserts or implies an objective fact,
that the factual assertion is false, and that the statement was with "actual malice."  Actual

---

[184] *See* Dockets 105, 106.  Furthermore, Ms. Kjera was not at work during the leafleting
so would not have personal knowledge of the Union representatives' conduct.  Fed. R. Civ.
P. 56(c)(4).
[185] Dockets 93-2 at 10–11; 152-2.
[186] *See* *Carpenters Loc. Union No. 1506*, 355 NLRB 1330 (2010) (NLRB stating that
unless banners impaired ingress and egress to a business's entrance, even very close banner
placement to an entrance would not be coercive), *c.f. Ameristar*, 2018 WL 4052150, at *10 (finding
a dispute of material fact where a witness's deposition and later declaration established that union
representatives handed out literature two to three feet in front of the witness's restaurant's main
entrance, and where the witness characterized the activity as "effectively blocking the front door").
However, none of Hilton's photographs here show Union representatives within three feet from
the Denali FCU entrance.

*CP Anchorage Hotel 2, LLC v. Unite Here! et al.*       Case No. 3:18-cv-00071-JMK
Order re: Summary Judgment             Page 31

Case 3:18-cv-00071-JMK   Document 159   Filed 09/03/21   Page 31 of 35

malice is a reckless disregard or actual knowledge that the assertion is false.[187]  Courts do not reach the issue of actual malice unless they first find a false statement of fact.[188]

Plaintiff presents hearsay evidence that staff of certain VCS members' offices talked to the Union representatives, then left messages for their veterinarians, who then told Dr. Parshley, who reported to Ms. Strother, that they, the veterinarians, had received messages from Dr. Parshley that the conference was cancelled.[189]  Because the Court only has Ms. Strother's deposition testimony, the rest of this message chain is inadmissible hearsay.[190]  Meanwhile, Defendants have presented admissible declaration evidence that Union callers called VCS members and told them to call Dr. Parshley to ask her to support the boycott and move the conference away from the Hilton.[191]  The Court makes all reasonable inferences in favor of the nonmoving party.  Yet it is not a reasonable inference that Carlos Cruz or Sana Siddiq impersonated anyone, made statements that the conference had been cancelled, and later misrepresented that they had not done either of those things in sworn statements.

Hilton argues that its contention is supported by phone message records from the veterinary practices at the University of Georgia.[192]  However, Hilton did not provide

---

[187] *Steam Press*, 302 F.3d at 1004–5.

[188] *See id*. at 1009 n.6.

[189] Dockets 52-1 at 6–7; 104-1 at 29–31.

[190] Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *c.f. Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003) (distinguishable because the hearsay evidence there, a diary of the declarant, could be admissible at trial under hearsay exceptions or other evidence rules).

[191] Dockets 93-4 at 2–4; 93-6 at 3–4.

[192] Dockets 104-2 at 3; 104-3 at 2 *et seq.*

any declaration or sworn statement by Dr. Parshley, from any of the members who reportedly received the messages, or apparently by any person who would have spoken directly with the Union representatives.[193]  The Union maintains that, in light of Mr. Cruz and Ms. Siddiq's sworn testimony, there is no colorable evidence of fraud beyond a triple- or quadruple-hearsay misunderstanding:  Ms. Strother hearing from Dr. Parshley who heard from three VCS members reporting what they understood from their staff who actually logged the messages from and/or spoke to the Union callers.[194]  Indeed, the direct evidence of receptionists' notes, call logs and phone pad records support the Union's position that Mr. Cruz identified himself and said he was calling about a boycott on the conference hotel, and that he asked them to have VCS members call Dr. Parshley.[195]

Hilton cannot establish that Union representatives said that they were Dr. Parshley, nor that Dr. Parshley had cancelled the mid-year conference, without presenting testimony or declarations of any people who spoke with a caller.  Because a finding that a false or defamatory statement was made is unsupported, and in fact is contradicted by admissible non-hearsay evidence, Hilton has failed to meet its burden that there exists a genuine issue of fact regarding defamation.

---

[193]  *See* Dockets 104; 104-5; 137-1 (listing, with concise descriptions, exhibits to Plaintiffs' briefing).  *See also* Docket 104-3 at 14 (email from a VCS member stating "I did not have any contact with the person/people who called.  I just received a message asking me to call Lisa Parshley.").

[194]  *See* Docket 113 at 9, 22.

[195]  *See* Docket 104-3 at 15–16 (secretarial notes indicating the message taker heard the name "Carlos Cruz" and that at least one veterinarian apparently understood the caller(s) were "trying to boycott the hotel the conference was at").

**D.      There is No Need to Reach the Question of Damages Because there is no Violation of § 8(b)(4) as a Matter of Law**

Even if the Court were to find that Plaintiff's claim that Defendants violated § 8(b)(4) could survive summary judgment, the Court maintains serious doubt that Hilton has presented colorable evidence to establish an entitlement to damages under the LMRA. First, the Hilton-VCS contract contained a duty for Hilton to mitigate damages, yet Hilton waived the funds that it could have recovered when VCS cancelled the contract. Additionally, although CP Anchorage Hotel 2, LLC would not receive any benefit when VCS re-booked their conference at the Anchorage Marriott, the ultimate owner of both properties approved the waiver of the cancellation penalty. Second, the AK-SHRM conference was "sold out" to attendees. Hilton alleges that multiple exhibitors dropped out between 2017 and 2018, but this is not supported by the numbers overall. The 2018 conference only had one more in-kind sponsor and one more exhibitor (out of 24–25 total) than the 2017 conference.[196] Nor can Hilton attribute the attrition of 2017 sponsors and exhibitors to Union activity, as none of the 2017 sponsors or exhibitors have stated any reason for their absence in 2018. Hilton has presented no evidence that the Union activity was the cause of any perceived loss regarding the AK-SHRM contract. Lastly, although Hilton claims they re-negotiated with AK-SHRM for their next conference from a weaker bargaining position, Hilton is unable to prove any actual loss since no conference was held nor could have been held in 2020 due to the COVID-19 pandemic.

---

[196] *See* Docket 104-4 at 8, 9.

# VI.   CONCLUSION

For the reasons stated above, the Court concludes that there is no dispute as to any material fact in this case, and Defendants Unite Here! and Unite Here! Local 878 are entitled to judgment as a matter of law.   The motion for summary judgment is GRANTED.   This resolves all of Plaintiff CP Anchorage Hotel 2, LLC's claims. Therefore, this action is DISMISSED.

# VII.   OTHER PENDING MOTIONS

Two other motions are outstanding before the Court.  Plaintiff filed a motion to continue Defendants' motion for summary judgment pursuant to Civil Rule 56 on August 14, 2020.[197]  This motion is decided under separate order today.  Defendants filed a motion to strike "contentions and evidence" from Plaintiff's filing at Docket 103 (Plaintiff's opposition to the motion for summary judgment) on September 9, 2020,[198] which is hereby DENIED.

IT IS SO ORDERED this 3rd day of September, 2021, at Anchorage, Alaska.


        /s/ Joshua M. Kindred
        JOSHUA M. KINDRED
        United States District Judge

---

[197] Docket 107.
[198] Docket 118.

*CP Anchorage Hotel 2, LLC v. Unite Here! et al.*     Case No. 3:18-cv-00071-JMK
Order re: Summary Judgment                            Page 35

Case 3:18-cv-00071-JMK   Document 159   Filed 09/03/21   Page 35 of 35